COUNTY OF MUSKEGON

MUSKEGON COUNTY BOARD OF COMMISSIONERS

HEARING BOARD

IN THE MATTER OF:

JOHN WARNER

---

**John C. Schrier (P36702)**　　　　　　　**Kevin Even (38599)**
ATTORNEY FOR COUNTY OF MUSKEGON　　ATTORNEY FOR JOHN WARNER

---

## OPINION OF THE HEARING BOARD

### PREFACE

Pursuant to Rule XV of the Muskegon County Board Rules ("Board Rules")[1], the

Muskegon County Board of Commissioners has the duty to sit as a Hearing Board ("Board") to

determine if the removal or termination of one of Muskegon County's department heads is

appropriate under the standards set forth by law and the Board Rules.  This is a duty that,

thankfully, the Board is not called upon to do often.  It is also a duty that the Board takes very

seriously.

### PROCEDURAL HISTORY

John Warner ("Warner") served as Muskegon County's Director of its Department of

Public Works ("DPW") since 2011.  On May 25, 2016, Muskegon County's Administrator,

Mark Eisenbarth ("Eisenbarth"), suspended Warner, with pay, with a recommendation of

discharge.  Written notice of that action was given to Warner via letter issued by the County's

---

[1] Citation to the Muskegon County Board Rules shall be made as "*BR*", with the Board Rule's number and any subsections noted.  Muskegon County's Board Rules are available online at: http://www.co.muskegon.mi.us/boardofcommissioners/boardrules.pdf.

Corporate Counsel, Douglas M. Hughes, and delivered to Warner personally in Mr. Hughes'

office. (Exhibit 2). Board Rule XV allows the County's Administrator to discipline a Director,

such as Warner, including "a suspension or a suspension with a recommendation for discharge."

*BR* XV(6)(A). There is no progressive discipline for a director. *Id.* The Board Rule continues

to state, "The Administrator may recommend termination if the Director is incompetent to

execute properly the duties of the office or if the Administrator is satisfied that the Director is

guilty of official misconduct, or habitual or willful neglect of duty, and if the misconduct or

neglect is a sufficient cause." *Id.* The notice provided to Warner on May 25, 2016, stated as

follows:

> This letter shall serve as your written notice of suspension with a recommendation
> of discharge. The reasons for this action are as follows:
> A.    Your unprofessional conduct at the last meeting of the Solid Waste
> Planning Committee.
> B.    Your conduct creating what could be termed a hostile work environment
> for other members of County staff.
> C.    Your actions contrary to the statutory authority and bylaws of the Solid
> Waste Planning Committee.
> The County Administrator has determined that these actions demonstrate that you
> are unable to execute properly the duties of your office.

Board Rule XV also provides for a pre-termination hearing before the Chairperson of the

Muskegon County Board of Commissioners. By letter dated May 26, 2016, Warner requested

such a hearing. "At the pre-termination hearing, the Director may be represented and shall have

the opportunity to present reasons why discharge is inappropriate." *BR* XV(6)(D). The Chair is

empowered by that Board Rule to affirm the discharge, impose a lesser discipline, or refer the

matter to the Hearing Board.

The pre-termination hearing was held on June 29, 2016, and the Chair affirmed the

discharge. By letter dated June 29, 2016, personally delivered at the end of the pre-termination

hearing by Warner's counsel, Warner appealed the decision of Chair Sabo to this Hearing Board.

E:\Warner Opinion.docx

The Board met on August 24, 2016, to begin the hearing into this matter. Warner was present and represented by Attorney Kevin Even. Administrator Eisenbarth was also present, and he and the County were represented by Attorney John Schrier. Both sides had an opportunity to call witnesses, ask questions, cross-examine and present exhibits. Muskegon County Corporate Counsel Douglas Hughes advised the Board. Eight (8) witnesses testified before the Board that day, and the Board also had the opportunity to ask questions of the witnesses.

Pursuant to agreement between the parties, and pursuant to *BR* XV(6)(E)(3)(E), the remainder of the testimony was taken via deposition. [2] The depositions of six (6) witnesses, including Warner, were taken on September 1, 2016. Their testimony was both video-recorded and transcribed. One member[3] of the Board attended and asked questions. The videos and transcriptions were made available to the Board.

Pursuant to agreement between the parties, the record of this matter closed on September 12, 2016, giving the Board then 30 days to deliberate and render its decision. *BR* XV(6)(E)(9)(D)(vi). The parties each submitted proposed findings of fact, and closing arguments in writing.

## FINDINGS OF FACT

Both parties submitted several findings of fact. Board Rule XV requires this Board to rule on each finding of fact so submitted. Each Commissioner received each party's findings of fact, and determined individually whether the proposed finding of fact was probative, irrelevant or immaterial, or unduly repetitious. A chart containing the results of those findings of fact and the Board's rulings thereon is attached as Exhibit 1 and incorporated herein.

---

[2] Hearing Transcript, August 24, 2016, p. 15, 213-214, 299.
[3] Commissioner Susie Hughes.

F:\Warner Opinion.docx

## CONCLUSIONS OF LAW

This Board had the opportunity to observe the testimony of fourteen (14) witnesses, both in person and via video-recorded deposition, which allowed the Board to make determinations about each witness's credibility. The Board also considered numerous exhibits submitted in this matter, heard oral argument and considered the final arguments submitted by each party.

### I. Standard of Review

MCL 46.11(n) provides that the County may:

> … remove an officer or agent appointed by the board if, in the board's opinion, the officer or agent is incompetent to execute properly the duties of the office or if, on charges and evidence, the board is satisfied that the officer or agent is guilty of official misconduct, or habitual or willful neglect of duty, and if the misconduct or neglect is a sufficient cause for removal. However, an officer or agent shall not be removed for that misconduct or neglect unless charges of misconduct or neglect are presented to the county board of commissioners or the chairperson of the county board of commissioners, notice of the hearing, with a copy of the charges, is delivered to the officer or agent, and a full opportunity is given the officer or agent to be heard, either in person or by counsel.

As stated by the Court of Appeals in *Swiercz v. Crawford County Bd. of Comm'rs*, opinion per curium of the Court of Appeals, decided Oct. 16, 2003 (Docket No. 232344); 2003 Mich. App. LEXIS 2598, *5; 2003 WL 22359384, wherein a County Board of Commissioners removed one of their members:

> Courts are bound by the intent of the legislature and its plain meaning. *Booth Newspapers, Inc v Univ of Michigan Bd of Regents*, 444 Mich. 211, 221, 224; 507 N.W.2d 422 (1993). Statutes must be construed to avoid rendering words in a statute mere surplusage. *Id.* at 228. The statute first uses the word "opinion" and then states "if the board is satisfied." MCL 46.11(n). The language of the statute indicates that the removal of an appointed commissioner is indeed based on the board's opinion that sufficient cause for removal has been presented.

Therefore, this Board must determine, in its opinion, whether it is satisfied that Warner is incompetent to execute properly the duties of his office.

E:\Warner Opinion.docx

II.    Unprofessional Conduct at the May 4, 2016 Solid Waste Planning Committee Meeting

The first of the allegations stated in the letter notifying Warner of his suspension with recommendation of termination involved his conduct at the May meeting of the Solid Waste Planning Commission ("SWPC"). Adjacent to the Muskegon County Solid Waste Management System ("County Landfill") is 1,600 vacant acres of land south of Apple Avenue. Leading up to the May 4, 2016 SWPC meeting the use of the 1,600 acres were the subject of multiple meetings and discussions throughout the County. Administrator Eisenbarth testified that possible uses included using the property as a wind farm, a recycling center or to generate solar energy. HT, p. 189. Warner was aware of the discussions and, in fact, had participated in a meeting the prior month (April 8, 2016) with Geronimo concerning a wind farm proposal for the entire 1,600 acres. The meeting re-iterated that the County was interested in a proposal for the entire 1,600 acres.

Depending upon the use of the 1,600 acres, the SWPC may have had a role to play. It is clear that Warner wanted to expand the current County Landfill onto the adjoining 1,600 acres. By May 4, 2016, the County had not made a final determination as to what to do with the 1,600 acres. However, at the May 4, 2016 SWPC meeting, DPW employee Greg Leverance made a presentation concerning the solid waste landfill expansion. The presentation made it appear that the 1,600 acres was going to be used to expand the landfill. Commissioner Lohman interjected and the meeting was paused. A discussion occurred in the hallway involving Commissioner Lohman, Warner and Greg Leverence. While the tape recording of the meeting does not record the conversation in the hallway, what was reported to Eisenbarth was that Warner raised his voice to Commissioner Lohman. What is recorded is that it is Commissioner Lohman who, on several occasions, needed to inform the SWPC Members that the presentation is simply a

F:\Warner Opinion.docx

proposal. It is Commissioner Lohman who notes that no decision of the use of the property has been made.

Rather than managing the differences in opinions and insuring that the SWPC was accurately informed, Warner approached the County Administrator and requested that Eisenbarth get Commissioner Lohman and the SWPC under control. County Exhibit 31.

Prior to Eisenbarth becoming County Administrator, he was Director of the Wastewater System. There, he worked with Warner, who worked for the DPW. Both Eisenbarth and Warner reported to Dave Kendrick, who was the previous Director of the DPW. While Director of the Wastewater System, Eisenbarth was able to observe Warner interact with the County Commissioners. At that time, Warner was in charge of managing the public parks under the County's control. The Board, unhappy with Warner's ability to manage the County's public parks, decided to replace Warner with Bob Lukens. Warner was unhappy with his removal from public parks and became very upset with and hostile towards the Board.

Performance evaluations for Warner evidence a pattern of Warner's inability to get along with colleagues. In 2005, when Warner was a Public Works employee, Dave Kendrick ("Kendrick"), Director of Public Works wrote on Warner's performance evaluation that he needs to "…remember to show [the Board of Public Works] respect." See County Exhibit 5. Two years later, Kendrick gave Warner a similar evaluation stating the Warner must "…remember to use tact with commissions, avoid telling them how things must be." See County Exhibit 6. In 2011, Bonnie Hammersley ("Hammersley") was the County Administrator and felt that Warner needed to "…improve his project management skills…", that he "…must improve communication…" and that he displays "…attitude towards his subordinates." See County Exhibit 9. In a 2013 evaluation, Hammersley noted that Warner participated in an argument with

a customer and that an individual in his position should have handled themselves more professionally. Hammersley continued, stating that Warner has a tendency to attempt to resolve conflicts via email which has not been efficient and that he has failed to be a positive role model for his subordinates.

Warner's pattern of being confrontational, a poor leader and causing conflicts have continued. On numerous occasions, more specifically described below, Warner's inability to effectively communicate and manage has created an issue within the County. These issues are continuously brought to the attention of Administrator Eisenbarth who has to attend to the situation or relationship. As County Administrator, Eisenbarth oversees multiple County departments; however, no other department requires the level of oversight as the DPW as a result of Warner's conduct.

III.     Conduct Creating a Hostile Work Environment

Eisenbarth received numerous complaints from Warner's subordinates and colleagues. Many of the complaints share a theme of Warner making accusations and/or escalating a situation, prior to receiving all the relevant facts, and then later apologizing. All of the complaints involve Warner's inability to manage and effectively resolve conflicts with his subordinates and colleagues.

   *i.*  *Warner's Inappropriate Interactions with Sara Damm.*

One of the main objectives of the SWPC is further recycling in the County. Sara Damm ("Damm"), Muskegon County Sustainability Coordinator and subordinate of Warner, plays a large role in advancing recycling in the County. For most of Damm's employment with the County, Damm reported to Warner, was part of the DPW budget and located at the DPW offices.

F:\Warner Opinion.docx

Damm testified that County Administrators Hammersley and later Eisenbarth were very supportive of the concept of sustainability and recycling. Unfortunately for Damm, Warner was not supportive of recycling and sustainability projects. On multiple occasions, Warner would authorize and observe the County's employees spend time and energy on projects related to advancing recycling and sustainability. Often, Warner informed others that he would not support a proposal if it would not make money for the DPW.

For instance, the Townships of Dalton and Fruitland each manage a transfer station. Over the past few years the County, Dalton Township and Fruitland Township have entertained the idea of closing the current locations of the transfer station and consolidating the transfer stations. The rationale behind the consolidation is that it would be more efficient and less expensive for the townships. Such a consolidation requires the support of Warner as the DPW Director and Dalton and Fruitland Townships. In support of the consolidation, the County decided to attempt to obtain grants that would assist the consolidation. Connie Maxim-Sparrow ("Maxim-Sparrow"), Muskegon County Grants Coordinator, lead the effort to obtain the grants. Assisting Maxim-Sparrow in her efforts was Damm. Maxim-Sparrow and Damm successfully obtained a grant from Alcoa ("Alcoa Grant") but failed to obtain a grant from the State.

With the possibility of a consolidation of the transfer station, Maxim-Sparrow and Damm approached the DPW, specifically, Warner, its Director, regarding support for the consolidation. Support by Warner was necessary prior to approaching Dalton or Fruitland Township, as the townships would not waste time exploring the possibility of a consolidation without the support of the DPW. Warner, who sat back and watched the County, the SWPC, including Warner's subordinate and the Solid Waste manager Greg Leverence, Maxim-Sparrow, and Damm spent countless hours and energy trying to complete the consolidation, unexpectedly scuttled it behind

8

the guise of fiscal responsibility. Without the support of the DPW, there was no possibility of consolidating the transfer stations and the County Landfill. Accordingly, Dalton and Fruitland Townships declined to take any official action.

In addition to assigning moot projects to Damm and Maxim-Sparrow, Warner made inappropriate correspondences to Damm. During the summer of 2014, while drinking at Boar's Belly, Warner invited Damm to meet him for drinks. Over a multiple hour exchange, Warren continued asking and Damm continued to decline. After Warner acknowledged almost getting in a fight at the Boar's Belly, Warner asked Damm to keep this between the two of them. Damm does not speak of the invitation until the summer of 2016.

In addition, the Board was provided multiple emails concerning the derogatory means of communicating with Damm on performance issues. Warner's actions are consistent. Warner would send a derogatory email concerning some action taken by Damm or failure of Damm to perform, a response, Warner investigates and then apologizes to someone else. See County Exhibits 17, 20, 24, 26, 27 and 28.

For instance, on February 16, 2016 Warner sends an email to Damm with a copy to Beth Dick ("Dick"), Lee Burley ("Burley") and Cheryl Hansen ("Hansen") concerning her lack of following proper protocol in scheduling Facilities Management staff. After Damm apologizes with a copy to Dick, Burley and Hansen, Warner again sends an email that states that she needs a work request for any work performed by Facilities Management staff. However, the work was properly documented and approved by Warner, which Burley pointed out in an email to Warner. Instead of apologizing to Damm, Warner becomes argumentative with Burley, including noting that "I know that she favors asking you as she knows you will help her out. It's hard to say 'no' when an attractive lady asks for help, I get it." See County Exhibits 26 and 27. The statement is

demeaning.  While proper protocol should be followed, it was in this case and it should be expected that any employee would help another employee when asked and needed, without inappropriate or condescending reasons behind the actions.

During testimony, Warner portrayed Damm as a poor performing employee and Warner as trying to be fiscally responsible.  The examples concern travel authorization (April, 2015), unprofessional conduct involving City of Muskegon personnel (August, 2015), travel authorization (August, 2015), use of P-Cards (December of 2015), recycling guide (February, 2016), use of Facilities Management personnel (February, 2016), failure to arrive timely for a meeting with Muskegon Heights Fire Chief Dean (March 2016), printing of recycling guides (April, 2016), and grant acceptance procedure (May, 2016).  What is particularly troubling about many of these email messages from Warner is his tone.  Rather than merely informing Damm of issues, he, to coin a popular word in the vernacular, "mansplains" to her.  Typically, this word describes someone, typically a man, commenting on or explaining something to a woman in a condescending, overconfident, and often inaccurate or oversimplified manner.[4]  The condescending tone of these messages is inappropriate.

The Board further recognizes that Eisenbarth was unsure of what was the cause for Damm's poor performance so he moved her office to the County Building and assigned Dick as her supervisor.  Damm received training on a variety of County policies and while her performance is not perfect, even by her own admission, Damm's performance appears to have improved.  More perplexing is Warner's failure to complete performance evaluations, other than her six month evaluation, and impose any disciplinary action, including written reprimands if she was as bad an employee as portrayed.  The testimony of other DPW employees that acknowledge that other employees have done some of the same things which resulted in emails to Damm is

---

[4] See definition at http://www.dictionary.com/browse/mansplain (last retrieved 10/4/16).

E:\Warner Opinion.docx

also relevant and telling. In the totality of the circumstances, the mistakes made by Damm do not excuse Warner's behavior towards her.

Damm testified that she felt she was being harassed by Warner based upon a number of considerations, including his management style toward her. Further, it is clear from the testimony of Bracey that Damm was upset by that condescending tone in Warner's emails. Bracey testified that Damm contacted him. Bracey testified that Damm was emotional, distraught, concerned about retaliation if Warner discovered Damm had filed a complaint, and of losing her job. For those reasons, Damm did not file a formal complaint so Bracey tried to talk her through her issues. Bracey recognized that the context of the emails, which on their face might reflect merely shortcomings in Damm's performance, in this context left Damm feeling that she was being targeted.

ii.   *Warner's Inappropriate Interactions with Connie Maxim-Sparrow.*

While not a subordinate of Warner, Maxim-Sparrow witnessed Warner's actions. As the County's Grant Coordinator, Maxim-Sparrow was involved in many of the same projects as Damm. Maxim-Sparrow witnessed that not only was Warner unsupportive of nearly all recycling and sustainability projects, but would authorize and observe the County's employees spend time and energy on projects related to advancing recycling and sustainability only to reject the project because Public Works could not make a profit from it. Such an act is detrimental to County by wasting employees' time, which wastes County funds, it was detrimental to the morale of the employees overseen by Warner and created dissention between employees from multiple County agencies, departments, and committees.

Maxim-Sparrow's opinion that Warner was demeaning to staff, in particular Damm, resulted in her forwarding emails and discussing the situation with Dick and Eisenbarth. While

Warner suggests that the emails were provided to Eisenbarth after Warner's suspension, that is contrary to the facts. While the emails were gathered after the suspension for use in this proceeding, the emails and information was provided to Eisenbarth contemporaneous with the events.

As with inappropriate communication with Damm, it is also troubling to consider Warner's inappropriate emailing Maxim-Sparrow to meet him for a drink. On April 16, 2015, Maxim-Sparrow was in need of a tent for a United Way event on May 5. At 3:48 p.m. Maxim-Sparrow emails Bob Lukens and Warner asking if they have a tent and Bob Lukens responds within minutes that he does not. At 8:03 p.m. Warner responds "You got money, we got tent." At 8:06 p.m. Maxim-Sparrow responds "Lol!" At 8:09 Warner responds "So it is ☺ you know money talks. I am at Pigeon Hill. Come on down and we can discuss. I am buying." At 8:11 p.m. Maxim-Sparrow responds "Lol! Even funnier! I wish, I have been beaten up by the political gods the last two days and am on my couch catching up on budget crap. Thanks though. I will definitely take ya up on the beer another time though." At 8:14 p.m. Warner responds "Any time Connie. If you are bored come on down and bring hubby. It beats work. ☺" At 8:18 p.m. Maxim-Sparrow responds "That's no crap. Thanks, you would get along well with the hubby." At 10:39 p.m. Warner sends the final email "Your loss ☺ I am too s**tfaced to deal with it." See Warner Exhibits p. 89-90. The emails were forwarded to Dick and Eisenbarth the next day with her concerns of whether the County owned a tent, whether she had to rent it from Facilities and whether "[B]ecause I didn't go and meet him for a drink he is no longer willing to 'deal with it'?" See Warner Exhibits p. 89. These correspondences with Maxim-Sparrow were inappropriate considering the working relationship between Warner and Maxim-Sparrow.

12

   *iii.*   *Warner's Hostile Interaction with Dwight Avery.*

  Dwight Avery ("Avery") is the County's Accounting Manager.  During the early months of 2015, the DPW solicited bids relating to custodial services.  Those bids were submitted to the County's Accounting Services electronically.  On Tuesday, February 17, 2015 at 4:02 PM, Warner sent Avery an email stating that he needed all electronic bids by the following morning. The email was sent to Avery's personal email address, rather than the "Purchasing.Information" email address, where it should have been sent as that is the email address that handles such requests.  The following day Warner sent another email to Avery demanding the copies.  Warner continued in the email "I really don't appreciate having to ask for these twice.  This should have been done last Friday."  See County Exhibits 14 and 15.

  At 5:33 PM and approximately one-half hour after receiving the second email, Avery responded to "Purchasing.Information" and copied the County Administrator and Warner.  The following morning Warner sent an additional email to Avery that began "THIS IS MY THIRD REQUEST!!!!!" and ended, "I find it interesting though that when accounting wants some information, they will hound me to death to get it.  This is pathetic customer service." Copied on this email were Eisenbarth and Dick.

  Such an impatient and misled act is inexcusable by the Director of DPW.  Warner, being in a leadership position, should be interacting with his colleagues in a professional manner, much as Avery did in informing Warner that Warner's request was sent to the wrong email address. Rather than apologizing for his mistake, Warner grew impatient and hostile.

   *iv.*   *Warner's Inability to Manage Lee Burley.*

  Lee Burley, the County's Facilities Manager, is in charge of maintaining several County facilities.  In May of 2015, Burley and Steve Holke ("Holke") had a heated discussion

E:\Warner Opinion.docx

concerning an extension cord and a piece of equipment. Rather than mediate or resolve the situation, Warner allowed the situation to fester, and instead seemed to further provoke Holke and Burley by arranging meetings under false pretenses. Warner's actions, or lack thereof, resulted in Burley and Holke, who need to work together on a regular basis, having an undesirable work environment, for themselves as well as those around them. The disagreement escalated to the point that Burley and Holke were screaming at, and nearly becoming physical with, one another. It was not until Timothy Bracey was asked to intercede by Warner that Burley and Holke were able to meet and defuse the situation. Prior to Bracey's involvement, not only was Warner unable to amend the working relationship of Burley and Holke, he was responsible for it escalating.

   *v.      Warner's Hostility Toward Court Staff.*

   In August 2015, as the new Muskegon County Jail was being finished, DPW began installing parking signs in the Muskegon County Building parking lot. Judge Pittman, an employee of the County for more than 20 years, suggested parking stickers for the judicial staff. Upon learning of this suggestion, Warner sent an email to Eric Stevens, Craig Monette and Kathryn Howard stating that Warner had learned of Judge Pittman's suggestion and did not care what stickers the judges wish to put on their cars. Upon receipt of Warner's email, Craig Monette forwarded the email to Judge Pittman. See County Exhibit 21.

   Judge Pittman found Warner's email "ill-informed and disrespectful." Despite Judge Pittman's feelings regarding the email, Judge Pittman offered a simple and reasonable solution to the designated parking issue. See County Exhibit 21. Rather than following Judge Pittman's lead of being courteous, Warner responded by correcting Judge Pittman and requesting that if any court employees wanted the signs changed, they pay for them out of their budget. Warner

continued, requesting a fund and organization number to charge the new signs to court

employees. Despite the ill-mannered response from Warner, Judge Pittman once again

responded with a reasonable and cost-effective resolution to the manner. The emails end with

Judge Pittman writing:

> As it appears that we are finally at a point of resolution, this is my last email to you regarding this issue. Regardless of whether I was an intended recipient, the email in question was unquestionably disrespectful and your attempted apology is disingenuous and vapid.
>
> \* \* \* \*
>
> Your umbrage with my use of blind copies is, again, ill-informed and mistaken on your part. When you receive this email, it will have listed, everyone that I have included in this transmission, as has been the case during my entire involvement with this issue.

See County Exhibit 21.

Any and every County employee, including Judge Pittman, should be treated with respect

and not derision, and certainly should not be communicated with in the manner Warner

displayed. Warner, knowing multiple individuals were copied on the email, attempted to belittle

Judge Pittman and gave no regard to his suggestion. Much like Warner's apologies in other

situations, Judge Pittman recognized that Warner's apology was "disingenuous and vapid."

vi.     *Warner's Interaction with Beth Dick Regarding Overtime.*

Dick is the County's Finance Director/Assistant Administrator. As the Finance Director,

Dick oversees all aspects of the County's finances including employee's timesheets. Rather than

reaching out the Dick in a polite manner, on November 30, 2015 Warner sent Dick an email.

The email was hostile in nature and regarded Accounting Services questioning overtime logged

by the Facilities Department every Monday that timesheets were entered.

Warner told Dick that he was sure that Chris Wildey ("Wildey") was being told by

someone to question the overtime, which was not appreciated and should stop immediately.

Warner, by his own account, felt like the questioning made it appear that he did not know how to

F:\Warner Opinion.docx

schedule his employees.  Dick responded that Wildey was to question overtime for all employees, not just the Facilities Department employees, when there is anything that falls outside the scope of the personnel rules and there are no notes from the employee indicating the reason for the overtime.  Warner responded by apologizing for unnecessarily raising a red flag. See County Exhibit 23.  Again, Warner acts impulsively in accusing another employee of meddling in his department, before being informed of the facts, and then apologizing.

       vii.       *Warner's Actions toward HealthWest*.

HealthWest, formerly Community Mental Health, is an approximately $60 million community mental health provider.  As a health provider, HealthWest obtains and must dispose of contaminated and sensitive pieces of medical equipment and documentation as well as garbage and recyclable material.  As a County department, the County has provided HealthWest their waste receptacles.  Without any notice, Warner decided to cancel the outside contract.  See County Exhibit 22.  HealthWest's Executive Director Julia Rupp ("Rupp") was upset that she was neither informed of the decision, nor the intent to alter service, prior to the dumpsters being removed.  Whether it was on a trial basis or permanently, a department head, especially one with his or her own discrete facility and sensitive material, should be consulted prior to a change of this nature.

Removing HealthWest's disposal receptacles with no prior notice is inexcusable.  For the Director of the DPW to take such an action is egregious and shows a blatant disregard for other operations or a complete lack of competence.  As the Director of DPW, Warner should know the importance of a disposal receptacle at a health facility.  Regardless of Warner's rationale for removing the disposal receptacles, it is indefensible to fail to notify Rupp prior to their removal.

16

IV.     Actions Contrary to Statutory Authority and Bylaws of the Solid Waste Planning Committee.

Toward the end of 2015, the County decided to take part in a recycling feasibility study. The purpose of the study was to determine what recycling and sustainability efforts were feasible for the County to partake in. As the feasibility study began to come to fruition many commissioners, including Commissioner Lohman, began to have questions regarding the process, goals and objectives of the SWPC. On December 9, 2015, Commissioner Lohman sent Warner an email asking "[A]t today's meeting for a recycling program in the county a question was raised about using the solid waste committee to be the vehicle in the county to help move this forward." See Warner Exhibits, p. 146. Warner's reply on December 9, 2015 was "[C]urrently one of the major objectives is to further recycling in Muskegon County. We will be seeking comment from the committee members on the RFP for the recycling feasibility study that will go out soon." See Warner Exhibits p. 145. However, Warner failed or refused to seek comments on the RFP for recycling feasibility study from the SWPC.

When the SWPC attempted to have input on recycling, Warner obfuscated their attempts. In particular, the minutes of the May 4, 2016 SWPC meeting indicate that:

> Greg Leverence gave an update on the proposal and stated that staff is in the process of reviewing and rating the three (3) proposals received from GT Environmental, Gershman, Brickner and Bratton (GBB), and Resource Recycling.
>
> Chair Fisher asked Gerg Leverence if the recommended vendor would be run by the Committee.
>
> * * * *
>
> Chair Fisher asked who on the Board would like to review the proposal. Kim Arter, Chris Hall, Sidney Shaw, Kathy Evans, and Commissioner Lohman all raised their hands. Kim Arter, Sidney Shaw and Kathy Evans were selected.

See Warner Exhibits, p. 28. On May 12, 2016 following the Board of Public Works meeting Warner shared with Eisenbarth his displeasure of the involvement of Chair Fisher, Commissioner Lohman and the SWPC in the recycling study. Warner instructed Eisenbarth to get control of Commissioner Lohman and SWPC. See County Exhibit 31. On May 18, 2016, Eisenbarth responded that "I am not planning on making any decisions pertaining to study, (sic) that will be up to you and the SW committee." See County Exhibit 31. Again, rather than involve the SWPC, or the committee selected by the SWPC, in the selection of a recycling consultant, Warner asked corporate counsel for an opinion concerning the role of the SWPC. On May 19, 2016, Mr. Hughes' written opinion to Warner noted that the Natural Resources and Environmental Protection Act is not very specific, but that the SWPC is appointed to prepare an initial solid waste management plan, oversee its implementation and that the SWPC's powers relate to the solid waste management plan. The May 19, 2016 letter explains that the SWPC has the power to give advice, consultation and assistance to the County on matters including, but not limited to new landfill sites, modification of existing landfills and transfer stations. See County Exhibit 13. Five days later, on May 24, 2016 Warner advised Eisenbarth that "I am planning on moving forward with a motion to approve the consultant for the recycling study at June BPW (Board of Public Works) meeting unless directed differently. That committee (SWPC) was never intended to review the RFPs received and we need to get moving on this." See County Exhibit 31.

Although the RFPs were eventually reviewed by the SWP sub-Committee after Warner's suspension, Warner's actions were contrary to his stated intent in December of 2015, contrary to the instructions of Eisenbarth, contrary to the actions and intent of the SWPC, and contrary to state law as noted in the legal opinion of corporate counsel.

E:\Warner Opinion.docx

V.     Due Process

Warner has raised issues related to due process, in the notice of his suspension with recommendation of discharge, the pre-termination hearing, and before this Board.  Due process is necessary in a termination when an employee has a property interest in his or her continued employment.  The courts have recognized the central role of state or local law in ascertaining whether a protected property interest is present and that the law or practice of a particular jurisdiction substantially determines whether the employee has a protected property interest. *Board of Regents v Roth*, 408 U.S. 564, 577 (1972).   In that case, the Supreme Court held that property interests are not created by the Constitution but rather by "existing rules or understandings that stem from an independent source such as state law." *Id.*

The Board agrees that Warner had a property interest in his public employment with the County of Muskegon.  A reading of the Board Rules, particularly Rule XV, supports that fact, as well as a reading of MCL 46.11(n).  The essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950).

A.     Notice

By letter dated May 25, 2016, Warner was given written notice of his suspension with recommendation of termination and the reasons for it.  (Exhibit 2).  He was specifically directed to his behavior as a meeting of, and his actions in relation to, the Solid Waste Planning Committee, and his creation of a hostile work environment.  He requested further documentation through a request for his personnel file and a Freedom of Information Act ("FOIA") request.  He does not complain that the documents were not provided to him; just that they were not identified more specifically for him in response to his request.  The Board would note that Warner's FOIA

19

request was extensive, which no doubt yielded a large number of documents in response. The Board finds, in its opinion, that the notice to Warner was appropriate.

    *B.*    *Pre-termination Hearing*

Warner was afforded due process as required by Rule XV of the Muskegon County Board Rules, and as required by law. Pursuant to Rule XV, Warner was entitled to and did request a pre-termination hearing on this matter before the Chair of the Muskegon County Board of Commissioners, Chair Sabo. A hearing was held before Chair, at which Warner was represented by counsel, and at which time, Warner was afforded an opportunity to argue against his termination. After that pre-termination hearing, Chair Sabo affirmed the discharge.

Warner referenced the *Loudermill* decision as requiring the County in relation to his pre-termination hearing. *Loudermill v Cleveland Board of Education*, 470 US 532 (1985). Such a hearing was prescribed by the *Loudermill* Court as "an initial check against mistaken decision – essentially a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Id., at 545-546. Such a pre-termination hearing allows an employee an opportunity to respond to the allegations against him or her. Warner was given that opportunity, as a hearing was originally set for June 24, 2016, and then adjourned to June 29, 2016, to allow Warner and his counsel to review records supplied in response to the FOIA request. As such, it is the opinion of this Board that Warner was given due process of law with regard to his pre-termination hearing.

    *C.*    *Bias*

Warner has also complained that Muskegon County Corporate Counsel Douglas M. Hughes advised this Board during the hearing on this matter.[5] Warner brought this concern to the Board's attention for the first time at the hearing on August 24, 2016, with the contention that

---

[5] Hearing Transcript, August 24, 2016, p. 99).

E:\Warner Opinion.docx

he did not realize that Mr. Hughes had been involved in the investigation of Warner's actions prior to that time.  He seemed to believe that the Board could not be impartial if advised by Mr. Hughes.  Board Rule XV(E)(4)(D) provides:

> Unless required for disposition of an ex parte matter authorized by law, a member of the hearing Board assigned to make a decision or to make findings of fact and conclusions of law in a formal hearing shall not communicate, directly or indirectly, in connection with any issue of act, with any person or party, nor, in connection with any issue of law, with any party or his or her representative, except on notice and opportunity for all parties to participate.  **This prohibition begins at the time of the notice of hearing.**  A Hearing Board member may communicate with other members of the Board and may have the aid and advice of the County staff other than the staff which has been or is engaged in investigating or prosecuting functions in connection with the case under consideration or a factually related case.

(Emphasis added).  First, the Board Rule is clear that the prohibition only begins at the time of the notice of hearing, which was dated August 4, 2016.  Warner did not allege, and this Board has no reason to believe, that Mr. Hughes participated in any investigation or prosecution after that date.  It also seems unrealistic that Warner did not realize that Mr. Hughes was involved in the investigation prior to his suspension when the letter notifying him of said suspension was signed by Mr. Hughes and handed to him by Mr. Hughes in Mr. Hughes' office.  (Exhibit 2).

Mr. Hughes aided the Board in resolving evidentiary issues, as did the attorney advising the Plymouth-Canton Community School District Board of Education in *Plymouth-Canton Community Schools v. State Tenure Com.*, 435 Mich. 76, 80, 457 N.W.2d 656, 658 (1990).  This Board, just like the school board in that case, retained the exclusive authority to evaluate and judge the facts.

Finally, the Board and Mr. Hughes have no personal or official stake in the decision as to whether Warner should be dismissed, nor do they bear personal bitterness toward Warner.  *Hortonville Joint School Dist. v. Hortonville Education Asso.*, 426 U.S. 482, 491 (1976).

Warner has not argued that this Board or Mr. Hughes have any personal or financial stake in this decision that might create a conflict of interest, nor is there anything in the record to support any claim of personal animosity. *Id.* It is therefore the opinion of this Board that there was no bias in these proceedings before it.

## CONCLUSION

**This Board, after observing all the testimony and considering all of the evidence provided, finds that, in its opinion, it is satisfied that Warner is incompetent to execute properly the duties of the office of Director of Muskegon County's Department of Public Works.**

This decision is the final step in the administrative process. *BR* XV(6)(E)(6)(C). A decision of the Hearing Board may be appealed to the Circuit Court no later than sixty (60) days after the date of this Opinion, which is the final decision of the Hearing Board. *BR* XV(6)(E)(7).

Dated: October 11, 2016

COUNTY OF MUSKEGON
HEARING BOARD

_____
Terry J. Sabo, Hearing Officer

E:\Warner Opinion.docx

This Opinion was considered and adopted at an open meeting of the Muskegon County Board of Commissioners on October 11, 2016, by motion of Commissioner _Cross_, seconded by Commissioner _Engle_.

The vote with regard to the adoption of this Opinion was as follows:

| | | | | 8 ayes 1 Nay |
|---|---|---|---|---|
| Vice Chair Cross | ✓ Aye | ____ Nay | | |
| Commissioner Engle | ✓ Aye | ____ Nay | | |
| Commissioner Nash | ✓ Aye | ____ Nay | | |
| Commissioner Hughes | ✓ Aye | ____ Nay | | |
| Commissioner Lohman | ✓ Aye | ____ Nay | | |
| Commissioner Mahoney | ✓ Aye | ____ Nay | | |
| Chair Sabo | ✓ Aye | ____ Nay | | |
| Commissioner Scolnik | ✓ Aye | ____ Nay | | |
| Commissioner Wilkins | ____ Aye | ✓ Nay | | |

I hereby certify that the above is an accurate recording of the motion and adoption of this Opinion.

Dated: October 11, 2016

_Nancy A. Waters_
Nancy A. Waters, Clerk

E:\Warner Opinion.docx

EXHIBIT 1

| # | Probative | Irrelevant/ Immaterial | Unduly Repetitious | Finding of Fact |
|---|---|---|---|---|
| 1 | (6) Hughes, Mahoney, Wilkins, Sabo, Engle, Nash | (3) Scolnik, Lohman, Cross | | John K. Warner ("Petitioner") is a long time employee of the County of Muskegon ("County") and was appointed by the Muskegon County Board of Commissioners ("Board") as the Director of Public Works in 2011. |
| 2 | (9) Mahoney, Sabo, Scolnik, Wilkins, Engle, Nash, Cross, Lohman, Hughes | | | On May 25, 2016 the Muskegon County Administrator, Mark Eisenbarth, ("Administrator") suspended Petitioner's employment and recommended him for discharge. |
| 3 | (5) Mahoney, Hughes, Wilkins, Scolnik, Sabo | (4) Engle, Nash, Cross, Lohman | | The letter notifying Petitioner of his suspension of his employment as the Director of Public Works was hand delivered by the County's corporate counsel, Douglas M. Hughes ("Corporate Counsel"). |
| 4 | (7) Hughes, Mahoney, Sabo, Wilkins, Scolnik, Engle, Nash | (2) Cross, Lohman | | The letter stated that the Administrator determined Petitioner was "unable to execute properly the duties your office" due to the following reasons: <br> a. Petitioner's alleged "unprofessional conduct" at the last meeting of the Solid Waste Planning Committee ("SWPC"); <br> b. Petitioner's alleged creation of a "hostile work environment for other members of County staff, and <br> c. Unidentified "actions" of Petitioner that were "contrary to the statutory authority and bylaws of the SWPC." |
| 5 | (1) Sabo | (7) Hughes, Cross, Nash, Engle, Mahoney, Lohman, Scolnik | (1) Hughes | The letter did not state what conduct was deemed "unprofessional conduct." |
| 6 | (3) Wilkins, Sabo, Cross | (4) Hughes, Mahoney, Scolnik, Lohman | (3) Hughes, Engle, Nash | The letter did not state that Petitioner was incompetent to "execute properly the duties of your office." |
| 7 | (2) Sabo, Cross | (6) Hughes, Mahoney, Engle, Scolnik, Nash, Lohman | (1) Hughes | The letter did not state that Petitioner was guilty of official misconduct, or habitual or willful neglect of duties of his office. |
| 8 | (4) Cross, Scolnik, Sabo, Wilkins | (3) Mahoney, Lohman, Hughes | (3) Hughes, Engle, Nash | The letter did not identify any alleged behavior that was wrongful or that created a "hostile work environment." |
| 9 | (1) Sabo | (5) Hughes, Scolnik, Lohman, Mahoney, Cross | (3) Hughes, Engle, Nash | The letter did not identify any County employee who was subjected to a "hostile work environment." |
| 10 | (2) Wilkins, Sabo | (4) Hughes, Scolnik, Lohman, Mahoney | (3) Engle, Cross, Nash | The letter did not identify any "actions" that were "contrary to the statutory authority and bylaws of the SWPC." |
| 11 | (6) Mahoney, Hughes, Sabo, Cross, Wilkins, Engle | (2) Scolnik, Lohman | (1) Nash | On May 26, 2016 Petitioner requested a pre-termination hearing. |

| # | Probative | Irrelevant/ Immaterial | Unduly Repetitious | Finding of Fact |
|---|---|---|---|---|
| 12 | (4) Mahoney, Wilkins, Sabo, Hughes | (4) Scolnik, Nash, Lohman, Engle | | On May 26, 2016 Petitioner requested a complete copy of his personnel record pursuant to the Bullard-Plawecki Employee Right to Know Act. |
| 13 | (4) Wilkins, Hughes, Sabo, Mahoney | (5) Lohman, Scolnik, Nash, Engle, Cross | | On May 27, 2016 Petitioner was advised that his personal property could be picked up at Corporate Counsel's office during regular business hours. |
| 14 | (7) Cross, Mahoney, Hughes, Wilkins, Engle, Sabo, Nash | (2) Scolnik, Lohman | | On May 31, 2017 a written FOIA request was submitted to the Administrator seeking certain information relevant to the conclusions set forth in Corporate Counsel's letter of May 25, 2016. |
| 15 | (6) Mahoney, Hughes, Nash, Wilkins, Sabo, Engle | (2) Cross, Lohman | | The pre-termination hearing was scheduled for June 24, 2016. |
| 16 | (4) Mahoney, Wilkins, Hughes, Sabo | (5) Scolnik, Engle, Nash, Lohman, Cross | (1) Hughes | At the commencement of the pre-termination hearing Petitioner informed Commissioner Terry Sabo ("Commissioner Sabo") that no documents were produced in response to his FOIA request and his personnel file had not been produced as requested |
| 17 | (2) Wilkins, Sabo | (5) Scolnik, Nash, Lohman, Engle | (3) Mahoney, Hughes, Cross | As of the commencement of the pre-termination hearing Petitioner had not been provided with his personnel folder that had been requested on May 26, 2016. |
| 18 | (1) Sabo | (5) Scolnik, Engle, Nash, Lohman, Cross | (2) Mahoney, Hughes | As of the commencement of the pre-termination hearing Petitioner's counsel had not been provided with documents requested pursuant to a FOIA request dated May 31, 2016. |
| 19 | (1) Cross | (5) Mahoney, Hughes, Scolnik, Engle, Nash | (2) Hughes, Lohman | The actions of the Administrator, Corporate Counsel and the County in depriving Petitioner of a copy of his personnel file and copies of the documents relied upon by the Administrator in making his decision to suspend and recommend Petitioner for discharge were intentionally designed to deprive Petitioner of an opportunity to prepare for the pre-termination hearing. |
| 20 | (2) Mahoney, Sabo | (6) Lohman, Nash, Engle, Scolnik, Hughes, Cross | | No evidence, either by way of testimony or documentary evidence, was presented by the County or the Administrator at the pre-termination hearing; not a single witness or a single document. |
| 21 | (4) Wilkins, Mahoney, Hughes, Cross | (5) Scolnik, Engle, Nash, Lohman, Hughes | | After the close of the pre-termination hearing, Commissioner Sabo informed Petitioner that his FOIA request had been granted and his personnel folder was then produced. |
| 22 | (7) Mahoney, Hughes, Engle, Sabo, Wilkins, Cross, Nash | (2) Lohman, Scolnik | | Commissioner Sabo then adjourned the hearing until June 29, 2016 at 4:00 pm at Corporate Counsel's office. |
| 23 | | (6) Mahoney, Scolnik, Hughes, Nash, Engle, Lohman | | On June 25, 2016 Petitioner's counsel received approximately 10,000 emails to review however no documents were identified as those relied upon (as requested) by the Administrator in making his decision to suspend and recommend the Petitioner for discharge. |

| # | Probative | Irrelevant/ Immaterial | Unduly Repetitious | Finding of Fact |
|---|---|---|---|---|
| 24 | | (7) Mahoney, Hughes, Scolnik, Engle, Nash, Lohman, Cross | | The actions of the Administrator, Corporate Counsel and the County in producing approximately 10,000 emails rather than just copies of the documents relied upon by the Administrator in making his decision to suspend and recommend Petitioner for discharge were intentionally designed to deprive Petitioner of an opportunity to prepare for the adjourned pre-termination hearing. |
| 25 | (2) Cross, Sabo | (5) Lohman, Mahoney, Nash, Engle, Scolnik | (1) Hughes | At the time of the adjourned pre-termination hearing on June 29, 2016 no evidence, either by way of testimony or via documentation was produced by the County or the Administrator in support of the Administrator's decision to suspend and recommend Petitioner for discharge; not a word was spoken nor was a document produced. |
| 26 | (1) Cross | (4) Mahoney, Scolnik, Wilkins, Lohman | (3) Hughes, Engle, Nash | The actions of the Administrator, Corporate Counsel and the County in not producing testimony or documentation in support of the Administrator's decision to suspend and recommend Petitioner for discharge was intentionally designed to deprive Petitioner of due process of law. |
| 27 | (9) Mahoney, Wilkins, Sabo Hughes, Engle, Nash, Scolnik, Lohman, Cross | | | At the conclusion of the adjourned pre-termination hearing on June 29, 2016 Commissioner Sabo affirmed the decision of the Administrator. |
| 28 | (1) Sabo | (5) Scolnik, Cross, Lohman, Nash, Engle | (2) Mahoney, Hughes | As of the adjourned pre-termination hearing June 29, 2016 neither Commissioner Sabo nor the Administrator had listened to the audio tape of the SWPC of May 4, 2016 ("SWPC Meeting"). |
| 29 | (5) Hughes, Mahoney, Sabo, Engle, Nash | (3) Lohman, Scolnik, Cross | | Following the conclusion of the adjourned pre-termination hearing on June 29, 2016 the Petitioner demanded an appeal to the full Board in accordance with the Rules published by the Board. |
| 30 | (3) Sabo, Hughes, Mahoney | (5) Scolnik, Engle, Cross, Nash, Lohman | | The Board's rules state that a Director may be terminated only upon a finding by the Board that, in the Board's opinion, the Director is incompetent to execute properly the duties of the office or, on charges and evidence, the Board is satisfied that the Director is guilty of official misconduct or habitual or willful neglect of duty; and that the misconduct or neglect is a sufficient cause for removal. |
| 31 | | (7) Mahoney, Scolnik, Engle, Nash, Lohman, Hughes, Cross | (1) Hughes | On July 5, 2016 the Administrator discharged Petitioner by way of a written Notice of Dismissal signed by the Administrator without a full hearing of the Board. |
| 32 | (2) Wilkins, Mahoney | (4) Hughes, Cross, Engle, Nash | (3) Lohman, Scolnik, Hughes | When the Administrator terminated the Petitioner he was familiar with and understood the Board's rule that only the Board had the power to terminate the Director. |

| # | Probative | Irrelevant/Immaterial | Unduly Repetitious | Finding of Fact |
|---|---|---|---|---|
| 33 | (2) Wilkins, Cross | | (6) Mahoney, Hughes, Lohman, Scolnik, Engle, Nash | When the Administrator terminated the Petitioner he was familiar with and understood the Board's rule that only the Board had the power to terminate the Director. |
| 34 | (3) Cross, Lohman, Scolnik | (1) Hughes | (4) Nash, Engle, Mahoney, Hughes | The Notice of Dismissal states that Petitioner was "discharged, per board rules" and is dated "7/7/16." |
| 35 | (5) Mahoney, Nash, Engle, Hughes, Cross | (5) Mahoney, Nash, Engle, Hughes, Cross | (2) Lohman, Scolnik | A demand was made on July 12, 2016 by the Petitioner's counsel to Corporate Counsel requesting that the Administrator's termination of the Petitioner be rescinded as such termination was not authorized by the Board's rules. |
| 36 | (2) Hughes, Cross | (4) Scolnik, Nash, Engle, Lohman | (1) Mahoney | Even though Petitioner had already been terminated, a hearing in front of the full Board was scheduled for August 24, 2016. |
| 37 | | (2) Cross, Mahoney | (5) Hughes, Scolnik, Engle, Lohman, Nash | One of the charges listed by the Administrator in the letter of suspension and recommendation for termination was that Petitioner acted unprofessionally at the SWPC Meeting, yet no such unprofessional conduct was identified. |
| 38 | (2) Mahoney, Sabo | (4) Nash, Engle, Hughes, Cross | (2) Lohman, Scolnik | During the Administrator's testimony of August 24, 2016, he acknowledged that as of August 24, 2016 he had not listened to the audio tape of the SWPC Meeting. |
| 39 | (1) Cross | (3) Engle, Nash, Hughes | (4) Lohman, Hughes, Mahoney, Scolnik | The Administrator did not assemble the information requested by Petitioner's counsel to support the Administrator's charge that Petitioner was guilty of unprofessional conduct at the SWPC Meeting. |
| 40 | (4) Sabo, Hughes, Cross Mahoney | (4) Scolnik, Engle, Nash, Lohman | | The Administrator was not present at the SWPC Meeting. |
| 41 | (1) Cross | (5) Hughes, Nash, Engle, Scolnik, Lohman | (2) Hughes, Mahoney | Commissioner Jeff Lohman ("Commissioner Lohman") offered no evidence to support the charge that Petitioner was guilty of unprofessional conduct at the SWPC Meeting. |
| 42 | (9) Lohman, Hughes, Nash, Mahoney, Cross, Engle, Wilkins, Sabo, Scolnik | | (1) Hughes | Commissioner Lohman stopped the SWPC Meeting and asked Petitioner and Greg Leverence to go out in the hallway for a private discussion outside the confines of the SWPC Meeting. |
| 43 | (3) Cross, Mahoney, Sabo | (4) Scolnik, Engle, Nash, Lohman | (1) Hughes | The Chairman of the SWPC, Jim Fisher was present at the SWPC Meeting and did not observe any unprofessional conduct by Petitioner. |
| 44 | (2) Sabo, Cross Mahoney | (4) Lohman, Nash, Engle, Scolnik | (1) Hughes | The Secretary of the SWPC, Tina Nash, was present at the SWPC Meeting and is the person who took the minutes at the SWPC Meeting. |
| 45 | (3) Mahoney, Sabo, Cross | (4) Engle, Nash, Lohman, Scolnik | (1) Hughes | Tina Nash was present during the entire SWPC Meeting. |

4

| # | Probative | Irrelevant/Immaterial | Unduly Repetitious | Finding of Fact |
|---|-----------|----------------------|--------------------|-----------------|
| 46 | (2) Sabo, Mahoney | (1) Cross | (5) Hughes, Scolnik, Engle, Nash, Lohman | Tina Nash observed that at some point during the SWPC Meeting, Commissioner Lohman stopped the SWPC Meeting and asked Petitioner and Greg Leverence to go into the hallway and the SWPC Meeting was suspended. |
| 47 | (2) Sabo, Scolnik | (1) Lohman | (5) Hughes, Nash, Cross, Engle, Mahoney | Tina Nash did not ever hear Petitioner utter any unprofessional comments during the SWPC Meeting. |
| 48 | (1) Sabo | (3) Lohman, Mahoney, Cross | (4) Scolnik, Engle, Hughes, Nash | When the SWPC Meeting was suspended and Commissioner Lohman, Petitioner and Greg Leverence went into the hallway Tina Nash could hear only one person and that was Commissioner Lohman. |
| 49 | (2) Sabo, Mahoney | (2) Scolnik, Lohman | (3) Nash, Hughes, Engle | Kim Arter is the duly elected Supervisor of Laketon Township and the Vice Chairman of the SWPC and was present at the SWPC Meeting. |
| 50 | (1) Sabo | (2) Lohman, Mahoney | (4) Engle, Nash, Scolnik, Hughes | Kim Arter was present during the whole course of SWPC Meeting and did not ever hear Petitioner utter any words that she thought constituted unprofessional conduct. |
| 51 | (1) Sabo | (1) Mahoney | (5) Engle, Hughes, Nash, Lohman, Scolnik | Kim Arter did not hear any raised voices coming from the hallway when Commissioner Lohman stopped the SWPC Meeting and asked Petitioner and Greg Leverence to go out in the hallway for a private discussion outside the confines of the SWPC Meeting. |
| 52 | (2) Mahoney, Sabo | (1) Lohman | (4) Scolnik, Engle, Nash, Hughes | Greg Leverence was in attendance at the SWPC Meeting and was also in the hallway following Commissioner Lohman's stoppage of the SWPC Meeting for a private discussion in the hallway involving Commissioner Lohman, Petitioner and himself. |
| 53 | (1) Sabo | (3) Scolnik, Lohman, Mahoney | (3) Hughes, Engle, Nash | Greg Leverence did not observe any unprofessional conduct by Petitioner during the SWPC Meeting or in the hallway following the stoppage of the SWPC Meeting by Commissioner Lohman. |
| 54 | (1) Sabo | (3) Mahoney, Scolnik, Lohman | (3) Nash, Hughes, Engle | Chris Hall is another member of the SWPC was present at the SWPC Meeting and did not observe Petitioner act unprofessionally in any way. |
| 55 | (1) Sabo | (6) Mahoney, Hughes, Scolnik, Engle, Lohman, Nash | Petitioner was not involved in any unprofessional conduct during the SWPC Meeting. |
| 56 | (1) Sabo | (3) Engle, Nash, Mahoney | (3) Lohman, Scolnik, Hughes | As of August 24, 2016 neither the County nor the Administrator informed Petitioner of the names of the County employees whom Petitioner alleged to have made subject to a "hostile work environment." |
| 57 | | | (6) Nash, Engle, Lohman, Hughes, Scolnik, Mahoney | Petitioner did not subject any County employee to a "hostile work environment." |

5

| # | Probative | Irrelevant/ Immaterial | Unduly Repetitious | Finding of Fact |
|---|---|---|---|---|
| 58 | (4) Wilkins, Sabo, Engle, Nash | (4) Mahoney, Scolnik, Lohman, Cross | (1) Hughes | The County is responsible for preventing harassment in the workplace, for taking immediate corrective action to stop harassment in the workplace and for promptly investigating any allegation of work-related harassment. |
| 59 | | (6) Mahoney, Cross, Engle, Nash, Lohman, Scolnik | (1) Hughes | Any member of management who has knowledge of what is believed to be conduct constituting harassment is required to report such conduct to the County's Equal Employment Opportunity Office ("EEOO") within five (5) business days, failure by any member of management to make such a report is subject to disciplinary action. |
| 60 | | (6) Scolnik, Nash, Engle, Lohman, Cross, Mahoney | (1) Hughes | The Administrator never made a report of harassment committed by the Petitioner to the County's EEOO. |
| 61 | | (2) Mahoney, Cross | (5) Scolnik, Nash, Hughes, Engle, Lohman | The actions of the Administrator, Corporate Counsel and the County in failing to give notice to Petitioner of what his unprofessional conduct was at the SWPC meeting until August 24, 2016 was a denial of due process. |
| 62 | | (2) Cross, Mahoney | (5) Hughes, Scolnik, Engle, Nash, Lohman | The actions of the Administrator, Corporate Counsel and the County in failing to give notice to Petitioner as of August 24, 2016 of the names of the County employees whom Petitioner alleged to have made subject to a "hostile work environment" was a denial of due process. |
| 63 | | (1) Cross | (6) Lohman, Engle, Hughes, Nash, Scolnik, Mahoney | The actions of the Administrator, Corporate Counsel and the County in failing to give notice to Petitioner as of August 24, 2016 of what behavior of his was contrary to the of Part 115, Solid Waste Management, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended, and bylaws of the SWPC was a denial of due process. |
| 64 | (2) Mahoney, Sabo | (4) Hughes, Nash, Engle, Cross | (2) Lohman, Scolnik | Beth Dick never made a report of harassment committed by the Petitioner to the County's EEOO. |
| 65 | (2) Sabo, Mahoney | (4) Nash, Cross, Hughes, Engle | (2) Scolnik, Lohman | Dwight Avery never made a report of harassment committed by the Petitioner to the County's EEOO. |
| 66 | (2) Mahoney, Sabo | (4) Cross, Hughes, Engle, Nash | (2) Lohman, Scolnik | Connie Maxim-Sparrow never made a report of harassment committed by the Petitioner to the County's EEOO. |
| 67 | (3) Sabo, Mahoney, Cross | (3) Nash, Engle, Hughes | (2) Scolnik, Lohman | Lee Burley never made a report of harassment committed by the Petitioner to the County's EEOO. |

| # | Probative | Irrelevant/ Immaterial | Unduly Repetitious | Finding of Fact |
|---|---|---|---|---|
| 68 | (2) Mahoney, Sabo | (5) Hughes, Scolnik, Engle, Nash, Cross | (2) Hughes, Lohman | Julia Rupp never made a report of harassment committed by the Petitioner to the County's EEOO. |
| 69 | (2) Sabo, Mahoney | (5) Scolnik, Engle, Cross, Nash, Hughes | (2) Lohman, Hughes | Judge Gregory Pittman never made a report of harassment committed by the Petitioner to the County's EEOO. |
| 70 | (1) Mahoney | (5) Nash, Engle, Scolnik, Cross, Hughes | (2) Hughes, Lohman | Sara Damm never made a report of harassment committed by the Petitioner to the County's EEOO. |
| 71 | (2) Sabo, Mahoney | (5) Cross, Nash, Engle, Scolnik, Hughes | (2) Lohman, Hughes | Greg Leverence never made a report of harassment committed by the Petitioner to the County's EEOO. |
| 72 | (1) Mahoney | (5) Lohman, Nash, Cross, Engle, Scolnik | (1) Hughes | Dwight Avery did not work for the Petitioner and was never subjected to an alleged "hostile work environment" created by the Petitioner. |
| 73 | | (5) Mahoney, Engle, Nash, Lohman, Cross | (1) Hughes | Connie Maxim-Sparrow did not work for the Petitioner and was never subjected to an alleged "hostile work environment" created by the Petitioner. |
| 74 | (1) Cross | (4) Engle, Nash, Lohman, Mahoney | (2) Scolnik, Hughes | Lee Burley was never subjected to an alleged "hostile work environment" created by the Petitioner. |
| 75 | | (4) Nash, Lohman, Engle, Cross | (3) Scolnik, Mahoney, Hughes | Julia Rupp is a Director of her own department and did not work for the Petitioner and was never subjected to an alleged "hostile work environment" created by the Petitioner. |
| 76 | | (5) Cross, Scolnik, Engle, Nash, Lohman | (2) Mahoney, Hughes | Judge Gregory Pittman is a member of the Judiciary and did not work for the Petitioner and was never subjected to an alleged "hostile work environment" created by the Petitioner. |
| 77 | (2) Hughes, Sabo | (6) Scolnik, Cross, Hughes, Engle, Lohman, Nash | (2) Hughes, Mahoney | The County concedes that Judge Gregory Pittman was never subjected to a "hostile work environment" created by the Petitioner. |
| 78 | (1) Wilkins | (5) Scolnik, Engle, Nash, Lohman, Cross | (2) Hughes, Mahoney | Sara Damm was never subjected to an alleged "hostile work environment" created by the Petitioner. |
| 79 | | (5) Scolnik, Engle, Lohman, Nash, Cross | (2) Mahoney, Hughes | Greg Leverence was never subjected to an alleged "hostile work environment" created by the Petitioner. |
| 80 | | (6) Mahoney, Scolnik, Lohman, Cross, Engle, Nash | (1) Hughes | Sara Damm has a long history of failing to abide by various County policies, including but not limited to the purchasing policy, the P-card policy, the travel authorization policy, submitting invoices for payment policy and the timesheet policy. |
| 81 | | (4) Nash, Engle, Mahoney, Cross | (3) Hughes, Lohman, Scolnik | Sara Damm admits that she repeatedly violated the foregoing County policies. |

7

| # | Probative | Irrelevant/ Immaterial | Unduly Repetitious | Finding of Fact |
|---|---|---|---|---|
| 82 | | (3) Nash, Engle, Mahoney | (4) Hughes, Cross, Scolnik, Lohman | Sara Damm, although having had her supervision transferred to the Administrator for almost a year continues to violate the County P-card and timesheet policy. |
| 83 | (1) Sabo | (6) Mahoney, Engle, Nash, Cross, Scolnik, Lohman | (1) Hughes | Petitioner directed Sara Damm to surrender her County issued cell phone at the Direction of the Administrator because she was not on call for emergency response. |
| 84 | (1) Sabo | (5) Scolnik, Mahoney, Lohman, Nash, Engle | (2) Hughes, Cross | The Administrator countermanded the Petitioner's direction to Sara Damm to surrender her County issued cell phone contrary to the County's policy and she was allowed to keep the County issued cell phone contrary to the County's policy. |
| 85 | (1) Mahoney | (2) Nash, Engle | (4) Lohman, Cross, Hughes, Scolnik | No investigation was ever conducted by the County's EEO regarding a claim that Petitioner was harassing any County employee. |
| 86 | (2) Sabo, Cross | (5) Mahoney, Scolnik, Engle, Lohman, Nash | (1) Hughes | As of August 24, 2016 neither the County nor the Administrator informed Petitioner of the provisions of the applicable statute and sections of the bylaws of the SWPC that he allegedly violated. |
| 87 | | (6) Engle, Nash, Lohman, Scolnik, Mahoney, Cross | (1) Hughes | Petitioner did not scuttle any effort to consolidate the Dalton Township and Fruitland Township Transfer Stations, rather Petitioner encouraged the consolidation. |
| 88 | (1) Sabo | (5) Cross, Lohman, Nash, Engle, Scolnik | (2) Mahoney, Hughes | The County did not present any evidence that Petitioner violated any statutory authority set forth in of Part 115, Solid Waste Management, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended, and/or bylaws of the SWPC. |
| 89 | (2) Mahoney, Sabo | (2) Lohman, Scolnik | (3) Engle, Nash, Hughes | The Petitioner is not a member of the SWPC. |
| 90 | (2) Cross, Sabo | (5) Scolnik, Nash, Engle, Mahoney, Lohman | (1) Hughes | The SWPC is an advisory committee only and has no budget and no power or authority to spend taxpayers' dollars. |
| 91 | (2) Sabo, Cross | (2) Nash, Engle | (4) Hughes, Scolnik, Lohman, Mahoney | The SWPC is an advisory committee only and has no power or authority outside of the limited role set forth in the statute and its bylaws. |
| 92 | (2) Sabo, Cross | (2) Nash, Engle | (4) Hughes, Scolnik, Lohman, Mahoney | The SWPC responsibilities are limited to the review and modification of the Muskegon County Solid Waste Plan, including, but not limited to, approval of new landfill sites, modification of existing landfills and transfer stations. |
| 93 | (1) Sabo | (3) Scolnik, Nash, Engle | (3) Lohman, Hughes, Mahoney | The SWPC has no authority or power to approve an RFP. |
| 94 | (1) Sabo | (4) Scolnik, Nash, Cross, Engle | (3) Lohman, Hughes, Mahoney | The SWPC has no authority or power to hire agents, employees or consultants. |
| 95 | (2) Mahoney, Sabo | (5) Scolnik, Nash, Engle, Lohman, Cross | (1) Hughes | The SWPC is limited to 14 specific members identified by statute. Section 11534 of Part 115, Solid Waste Management, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended. |

8

9

| # | Probative | Irrelevant/ Immaterial | Unduly Repetitious | Finding of Fact |
|---|---|---|---|---|
| 96 | (2) Sabo, Cross | (4) Engle, Nash, Lohman, Scolnik | (2) Mahoney, Hughes | MCL 324.11435 states that "a planning committee appointed pursuant to this section shall annually elect a chairperson and shall establish procedures for conducting the committee's activities and for reviewing the matters to be considered by the committee." Section 11435 of Part 115, Solid Waste Management, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended. |
| 97 | (1) Sabo | (4) Nash, Cross, Scolnik, Engle | (3) Hughes, Lohman, Mahoney | MCL 324.11535 states that a county solid waste management planning agency preparing a solid waste management plan shall prepare the plan with the advice, consultation, and assistance of the planning committee. Section 11535 of Part 115, Solid Waste Management, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended. |
| 98 | (1) Cross | (4) Lohman, Scolnik, Nash, Engle | (2) Hughes, Mahoney | The Board designated the County Board of Public Works as the responsible party for implementation, enforcement and management of the Muskegon County Solid Waste Plan, not the SWPC. |
| 99 | (2) Sabo, Cross | (5) Mahoney, Scolnik, Engle, Nash, Lohman | (1) Hughes | The Board's rules make it abundantly clear that the Board in determining whether a Director of a County Department should be terminated may have the aid and advice of the County staff other than the staff which has been or is engaged in investigating or prosecuting the claims advanced against the Petitioner. |
| 100 | | (6) Mahoney, Scolnik, Cross, Engle, Nash, Lohman | (1) Hughes | Corporate Counsel was actively involved in investigating the Petitioner's conduct that was testified to by County employees in this case and has acted as the Board's advisor throughout the presentation of the case against Petitioner indirect violation of the Board's rules. |
| 101 | (1) Cross | (3) Engle, Lohman, Nash | (3) Scolnik, Mahoney, Hughes | The Administrator made the decision to suspend and recommend Petitioner for discharge without an adequate rationale, and after having made the decision then, via Corporate Counsel, instituted an investigation to justify the Administrator's unsupportable decision. |

| # | Probative | Irrelevant/ Immaterial | Unduly Repetitious | Finding of Fact |
|---|-----------|------------------------|--------------------|-----------------|
| 1 | (8) Hughes, Mahoney, Nash, Engle, Lohman, Sabo Scolnik, Wilkins | | | Warner misled the SWPC and its members. |
| 2 | (8) Wilkins, Cross, Hughes, Engle, Mahoney, Sabo, Lohman, Nash | (1) Scolnik | | Warner acted unprofessionally at the SWPC meeting. |
| 3 | (9) Engle, Cross, Sabo, Nash, Lohman, Wilkins, Hughes, Scolnik, Mahoney | | | Warner interacted inappropriately with Sara Damm. |
| 4 | (9) Scolnik, Engle, Nash, Lohman, Wilkins, Sabo, Hughes, Cross Mahoney | | | Warner interacted inappropriately with Connie Maxim-Sparrow. |
| 5 | (8) Wilkins, Engle, Sabo, Mahoney, Scolnik, Nash, Lohman, Cross | | | Warner interacted hostilely with Dwight Avery. |
| 6 | (7) Nash, Scolnik, Sabo, Hughes, Cross Lohman, Engle | (1) Mahoney | | Warner was unable to manage Lee Burley. |
| 7 | (7) Mahoney, Scolnik, Sabo Wilkins, Engle, Lohman, Nash | (2) Hughes, Cross | | Warner was hostile toward court staff. |
| 8 | (7) Sabo, Scolnik, Nash, Lohman, Engle, Cross, Mahoney | | | Warner interacted inappropriately with Beth Dick regarding overtime. |
| 9 | (7) Lohman, Nash, Engle, Scolnik, Cross, Mahoney, Sabo | | | Warner's actions toward HealthWest were inappropriate. |

10

| # | Probative | Irrelevant/ Immaterial | Unduly Repetitious | Finding of Fact |
|---|---|---|---|---|
| 10 | (6) Hughes, Sabo, Nash, Scolnik, Mahoney, Lohman | (1) Cross | | Warner's actions resulted in Administrator Eisenbarth being constantly contacted by County employees with complaints thereof. |
| 11 | (8) Mahoney, Hughes, Sabo, Wilkins, Cross, Scolnik, Lohman, Nash | | | Warner created a hostile work environment. |
| 12 | (7) Sabo, Hughes, Mahoney, Scolnik, Engle, Nash, Lohman | (1) Cross | | Warner was incompetent to serve as County Director of Public Works. |
| 13 | (6) Lohman, Hughes, Wilkins, Sabo, Scolnik, Engle | (3) Nash, Mahoney, Cross | | Inappropriate requests to female County employees to meet Warner for drinks makes Warner incompetent to be a County Department head. |
| 14 | (7) Scolnik, Sabo, Engle, Hughes, Cross, Lohman, Nash | (1) Mahoney | | Sara Damm was concerned for her future employment with the County based upon the actions of Warner. |
| 15 | (8) Cross, Lohman, Hughes, Sabo, Mahoney, Scolnik, Engle, Nash | | | Warner's interaction with Court personnel and other department heads makes him incompetent to continue as a department head. |
| 16 | (7) Hughes, Sabo, Scolnik, Lohman, Nash, Engle, Mahoney | (1) Cross | (1) Wilkins | Warner's action at the May 2016 Solid Waste Management Committee Meeting makes Warner incompetent to be a department head. |
| 17 | (7) Engle, Scolnik, Sabo, Hughes, Nash, Lohman, Mahoney | (1) Cross | (1) Wilkins | Warner's action between December 2015 and May 2016 with County Commissioners and the Solid Waste Management Committee makes him incompetent to be a County Department head. |

11

# WILLIAMS | HUGHES PLLC
## ATTORNEYS

THEODORE N. WILLIAMS, JR. – 201
DOUGLAS M. HUGHES
JOHN M. KARAFA
SUSAN M. FRANKLIN
ENRIKA L.F. MCGAHAN
ZANETA I. ADAMS
SARAH R. MILLER

*Of Counsel:*
FRED C. CULVER, JR.
MICHAEL I. KLEAVELAND
MARK J. ANDERSON*
L. JAMES LEMMEN, MD*
DAVID B. MERWIN
*Also Admitted in CO

May 25, 2016

Mr. John K. Warner
3878 Nestrom Rd.
Whitehall, MI 49461

Re:    Your Employment with Muskegon County

Dear John:

The Muskegon County Administrator, Mr. Mark Eisenbarth, has the authority to discipline a director of a County Department, such as yourself, by suspension with a recommendation for discharge.  There is no progressive discipline procedure for a director.  At this time, Mr. Eisenbarth is prepared to suspend you from your position as Director of Muskegon County's Department of Public Works, with a recommendation of discharge.

Separation Agreement
You have the opportunity to determine how you would like your career with the County of Muskegon to end.  As part of that opportunity, I have prepared a proposed Separation Agreement, Release and Covenant Not to Sue.  Should you agree to it, your departure from County employment would be termed a resignation, and not a termination.  I recommend you read it carefully, and that you may want to consult with an attorney about its contents.

Particularly, you should be aware that you have 21 days from today's date to consider and sign the Agreement, or until June 16, 2016.  You would also have seven days following your signature to revoke your acceptance of the Agreement.

If you sign the Separation Agreement, the County will pay you your unused vacation time in the amount of 65.20 hours ($25,991.85) and your unused sick time in the amount of 720 hours ($33,110.64).  Should you not sign the Separation Agreement by June 16, 2016, and are instead terminated, you would forfeit any right to a payout for unused sick time.

Suspension with Recommendation of Discharge
Should you not be willing to sign the Separation Agreement, Mr. Eisenbarth is prepared to move forward with your suspension with recommendation of discharge.

**W·H**
**EXHIBIT**
2

Mr. John K. Warner
May 26, 2016
Page 2

<u>Notice of Reasons</u>
This letter shall serve as your written notice of suspension with a recommendation of discharge.
The reasons for this action are as follows:

- A.   Your unprofessional conduct at the last meeting of the Solid Waste Planning Committee.
- B.   Your conduct creating what could be termed a hostile work environment for other members of County staff.
- C.   Your actions contrary to the statutory authority and bylaws of the Solid Waste Planning Committee.

The County Administrator has determined that these actions demonstrate that you are unable to execute properly the duties of your office.

<u>Pre-termination Hearing</u>
Pursuant to Muskegon County Board Rule XV, you have the right to a pre-termination hearing before the Chairperson of the County Board of Commissioners, Terry J. Sabo, or his designee. Should you wish to request such a hearing, <u>you must do so within five (5) working days of today's date.</u>  Should you request such a hearing, it would not be held until after the expiration of the twenty-one day period of consideration of the Separation Agreement.

At such an informal pre-termination hearing, you may be represented by counsel and shall have the opportunity to present reasons why discharge is inappropriate.  The Chair or designee may then affirm the discharge, impose a lesser discipline, or take no action and refer the matter to the Full Board.  Should the Chair discharge you, you may appeal that action to the Board of Commissioners, who shall hear the matter as soon as practicable, pursuant to the Muskegon County Board Rules.

At this time, I will collect your County-issued items such as any keys, keycards, cell phone or laptop computers.  Should any of these items remain in your possession after this meeting, I would ask that you return them to my office as soon as possible.

Sincerely,

Douglas M. Hughes for
Williams Hughes, PLLC
Muskegon County Corporate Counsel
Direct Dial:  (231) 727-2119
E-Mail:  doughughes@williamshugheslaw.com

cc:    Mr. Mark Eisenbarth

F:\Users\MBG\com\warner\Warner 5-25-16.doc